# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

SHEILA KENNEDY,

        Plaintiff,

        v.

NATIONAL RAILROAD PASSENGER
CORPORATION,

        Defendant.

Civil Action No. 13-cv-01819 (BAH)

Judge Beryl A. Howell

## Memorandum Opinion

The plaintiff, Sheila Kennedy, who is proceeding *pro se*,[1] brings this action against her former employer, the National Railroad Passenger Corporation, d/b/a Amtrak ("Amtrak"), claiming that she was subjected to sexual harassment in 2009 and then retaliation by multiple co-workers and supervisors at several job sites, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), and the D.C. Human Rights Act, D.C. Code §2-1401.01, *et seq.* ("DCHRA"). Compl. ¶¶ 1–2, 73–131, ECF No. 1. Amtrak contends that the plaintiff "struggled" to do her jobs and "when co-workers or managers pointed out her deficiencies, she responded by" asserting "charges of discrimination and mistreatment." Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s Mem.") at 1, ECF No. 35. Pending before the Court is Amtrak's motion for summary judgment. For the reasons discussed below, this motion is granted.

---

[1] The plaintiff was represented by counsel when she filed her complaint and through discovery, but her counsel moved to withdraw due to "irreconcilable differences" shortly before the date that Amtrak's motion for summary judgment was due. Pl.'s Counsel's Mot. Withdraw As Attorney at 1, ECF No. 33. Counsel's motion to withdraw was granted, and the plaintiff's request for assignment of a *pro bono* attorney was denied, since she had "neither stated that she is working towards securing new counsel nor demonstrated any effort to obtain other representation. In addition, the plaintiff [did] not assert that she suffers from any hardship that would justify providing Court appointed pro bono counsel in the instant matter." Minute Order, dated September 3, 2014.

# I.      BACKGROUND

In opposing the pending motion for summary judgment, the plaintiff has not responded concisely to Amtrak's Statement of Material Undisputed Facts ("Def.'s SMF"), ECF No. 35-2, as required by Local Civil Rule 7(h)(1) and as directed in this Court's Order, dated November 26, 2014, at 3, ECF No. 38, but instead has filed approximately four hundred pages of various documents, *see* Pl.'s Conclusion Def.'s Mot. Summ. J. ("Pl.'s Opp'n") Exs. A–R, ECF No. 36-1–20; Pl.'s Mot. Dismiss Def.'s Mot. Summ. J. ("Pl.'s Suppl. Opp'n"), ECF No. 39, including nearly ninety pages of handwritten notes with varying degrees of legibility, *see* Pl.'s Opp'n Ex. O ("Pl.'s Handwritten Notes"), ECF No. 36-17. The Court has nevertheless carefully considered these submitted materials in evaluating the parties' factual assertions and arguments, and the inferences that can be drawn in favor of the plaintiff as the non-moving party. The facts pertinent to the plaintiff's claims are summarized below, with citation to the exhibits submitted by both parties, followed by a brief overview of the procedural history.

## A.      Factual History

The plaintiff alleges that she was subjected to sexual harassment by one co-worker in 2009, and then retaliation by three different sets of co-workers and supervisors in three different jobs in two different cities over the span of four years. Her alleged experiences in each of these jobs are described below.

### 1.      Plaintiff's Job on Moving Passenger Trains in Washington, D.C.

Following training for the job, the plaintiff was assigned, on April 14, 2008, to be an Amtrak Assistant Conductor working on moving passenger trains, which is called "Road" service. Def.'s SMF ¶ 1, 11. The duties for this job assignment included assisting passengers while they board and exit the trains, and collecting revenue from passengers, Def.'s Mem. at 1

n.2, with the "primary duty [] to ensure the safe operation of Amtrak's trains," *id*. at 1.  During this assignment, the plaintiff alleges that a co-worker, Conductor Dwight McClurkin ("Co-Worker 1"), committed four incidents of sexual harassment over the course of about seven months.  Def.'s Mot. Summ. J. ("Def.'s Mot.") Ex. D ("Pl. Dep.") 16:13–17:3, 24:24–25:4, 30:17–22, ECF No. 35-8.

The first incident occurred toward the end of 2008 or the beginning of 2009.  *Id*. 16:22–25.  The plaintiff alleges that Co-Worker 1 asked her about a club called Taboo and whether the plaintiff would go there with him, an invitation the plaintiff declined.  *Id*. 19:15–18; 20:7–13; Def.'s Mot. Ex. J ("Pl.'s July 9, 2009, Email") at 1, ECF No. 35-14; Pl.'s Opp'n Ex. A ("Pl.'s February 2010 Letter to EEOC") at 6, ECF No. 36-1.  The second incident occurred a few weeks later, when Co-Worker 1 allegedly again asked if the plaintiff had gotten the information regarding the club for him, Pl. Dep. 23:19–21, to which the plaintiff responded "no" and quickly walked away.  *Id*. 23:22–24; *see also* Pl.'s July 9, 2009, Email at 1; Pl.'s February 2010 Letter to EEOC at 6.

Approximately six months later, the plaintiff alleges that, on May 31, 2009, Co-Worker 1 asked her if she had a boyfriend.  Pl. Dep. 28:24–29:12; Pl.'s July 9, 2009, Email at 1; Pl.'s February 2010 Letter to EEOC at 7.  The plaintiff responded "no" and explained she was looking for someone who can keep up with her exercise regimen, which allegedly prompted Co-Worker 1 to say that he, too, can go a long time and that he was "long."  Pl. Dep. 29:24–29:12; Pl.'s July 9, 2009, Email at 1; Pl.'s February 2010 Letter to EEOC at 6–7.  After this incident, the plaintiff felt uncomfortable whenever Co-Worker 1 walked to her section of the train and looked at her.  Pl.'s July 9, 2009, Email at 2; Pl.'s February 2010 Letter to EEOC at 7.  Finally, the plaintiff alleges that, on July 4, 2009, Co-Worker 1 brushed up against her while she was collecting

tickets. Pl. Dep. 36:4–13, 38:13–39:4; Pl.'s July 9, 2009, Email at 2; Pl.'s February 2010 Letter to EEOC at 7.

The plaintiff did not report any of these four incidents when they occurred. Def.'s SMF ¶ 17. Instead, on July 5, 2009, the plaintiff allegedly confronted Co-Worker 1 about his sexually suggestive conduct and asked him to stop. Pl. Dep. 41:19–42:17; Pl.'s July 9, 2009, Email at 2; Pl's February 2010 Letter to EEOC at 7. Thereafter, Co-Worker 1 apparently stopped making any comments to the plaintiff that she perceived as sexual in nature but the plaintiff nonetheless alleges that Co-Worker 1 subsequently criticized her job performance, which made her feel uncomfortable. Pl.'s July 9, 2009, Email at 2; Pl's February 2010 Letter to EEOC at 8. The plaintiff cites instances in which Co-Worker 1 chided her for forgetting to collect tickets, for failing to find seats for passengers, and raising his voice once regarding cookie crumbs on the floor of a train. Pl.'s July 9, 2009, Email at 2; Pl's February 2010 Letter to EEOC at 7. In addition, on July 7, 2009, at the request of a family of four, the plaintiff turned two seats to face each other, in violation of safety standards, and when Co-Worker 1 asked her to restore the seats to a safe condition, she disobeyed his orders until compelled by a supervisor. Pl.'s July 9, 2009, Email at 2–3; Pl's February 2010 Letter to EEOC at 3–4.

Shortly after the plaintiff was reprimanded by a supervisor for creating unsafe conditions for passengers, the plaintiff sent an email, on July 9, 2009, to Amtrak's Dispute Resolution Office ("DRO"), summarizing the encounters she had with Co-Worker 1 that she believed were sexual harassment. Pl. Dep. 34:1–35:4. On July 10, 2009, the plaintiff attended a meeting with Co-Worker 1 and three supervisors to discuss the seat-turning incident, but did not mention any alleged sexual harassment. *Id.* 57:12-24. Although the supervisors recommended that Co-Worker 1 and the plaintiff work in separate cars to minimize contact between the two, *id.*, the

plaintiff allegedly had two more interactions with Co-Worker 1 in the beginning of August regarding the plaintiff's deficient work performance, Def.'s Mot. Ex. L ("DRO's Investigative Findings") at 3, ECF No. 35-16.

Approximately one month after sending her email to the DRO and the meeting with her supervisors, the plaintiff notified her immediate supervisor, who is a woman, for the first time, on August 6, 2009, of her sexual harassment allegations. DRO's Investigative Findings at 7 n.8. The supervisor allegedly advised the plaintiff that she had been the subject of complaints regarding her own inappropriate behavior, such as showing her abdominal surgical scars to coworkers. Pl. Dep. 99:8–17. The next day, DRO informed the plaintiff that interviews with other coworkers regarding the sexual harassment allegations would be initiated. DRO's Investigative Findings at 1. The plaintiff requested that DRO stop investigating her sexual harassment charge, *id.*, a request that the plaintiff reiterated on September 4, 2009, Def.'s Mot. Ex. M ("September 4, 2009, Email Exchange"), ECF No. 35-17. Despite the plaintiff's request, the DRO investigator, who is a woman, continued the investigation because "Amtrak is obligated to investigate [sexual harassment] complaints when it becomes aware of them." *Id.*

After interviewing the plaintiff and seven of her coworkers and supervisors, the DRO investigator found no evidence of sexual harassment or that the disagreements between the plaintiff and Co-Worker 1 were related to the plaintiff's alleged rejection of purported sexual advances, which could not be verified through other witnesses. DRO's Investigative Findings at 1, 8. Instead, three co-workers reported that the plaintiff engaged in inappropriate sexual conduct, such as making sexual comments about other coworkers and rubbing male coworkers' shoulders and heads. *Id.* at 6. Three coworkers cited the plaintiff's poor job performance as a reason for Co-Worker 1's fraught relationship with the plaintiff, *id.* at 5–7, and no supervisor

witnesses had heard from the plaintiff about sexual harassment prior to the investigation, *id.* at 7. The DRO concluded that both the plaintiff and Co-Worker 1 engaged in inappropriate conversations, though not necessarily with each other, and so both were provided with a copy of Amtrak's sexual harassment policy to review. *Id.* at 9. DRO forwarded these findings to the plaintiff. Def.'s Mot. Ex. N ("November 2, 2009, DRO Letter to Pl."), ECF No. 35-18.

Finally, on October 4, 2009, the plaintiff alleges that she felt intimidated by Co-Worker 1 who watched her perform a brake test. Pl.'s February 2010 Letter to EEOC at 6. This was the last time the two worked together since, on October 26, 2009, the plaintiff voluntarily transferred to a new job assignment working on empty trains within Amtrak's terminals and maintenance facilities, an assignment called working in the "Yard." Pl. Dep. 77:16–78:9.

### 2. Plaintiff's Job on Empty Passenger Trains in Washington, D.C.

Shortly after transferring to the Yard, the plaintiff filed a complaint with the EEOC, on January 10, 2010, and subsequently, on March 16, 2010, filed a formal Charge of Discrimination with the EEOC and the D.C. Office of Human Rights, claiming sexual harassment and retaliation. Compl. ¶ 40–41.

At her new assignment in the Yard, the plaintiff worked with a new set of supervisors and coworkers. Pl. Dep. 105:1–2; 114:2–14; Pl.'s Opp'n Ex. 1 ("Pl.'s Empl. Records") at 18, ECF No. 36-2. Here, too, the plaintiff's coworkers complained to supervisors about the plaintiff's poor job performance, after which her supervisors personally observed her and also found her performance deficient and unsafe. Def.'s Mot. Ex. B ("Broadus Decl.") ¶ 6, ECF No. 35-6; Def.'s Mot. Ex. C ("Maldonado Decl.") ¶¶ 5-6, ECF No. 35-7. As a result, the plaintiff was placed with a new Yard train crew, with co-workers who had more seniority and experience, and more time to train her. Broadus Decl. ¶¶ 8–9.

The plaintiff felt that her work in the previous Yard crew had been good and attributed her transfer, not to the perceived need for her to obtain more training, but to a male co-worker, on the previous Yard crew, who purportedly did not want to work with her due to her sexual harassment complaint against Co-Worker 1 and because she did not condone his unsafe practices. Pl. Dep. 142:23–145:6;  Compl. ¶ 44; Pl.'s Suppl. Opp'n at 8; Pl.'s Opp'n Ex. M ("Recording Trans.") at 1, ECF No. 36-15.  All parties agree that the plaintiff's performance did not improve with the new train crew. Def.'s Mot. Ex. A ("Smith Decl.") ¶ 11, ECF No. 35-5; Pl. Dep. 143:24–144:17.   As a result, on June 9, 2010, the plaintiff met with a senior supervisor and her union representative to discuss her performance deficiencies.  Broadus Decl. ¶ 12; Smith Decl. Ex. 1 ("August 17, 2010 Supervisor Letter"), ECF No. 35-5.  During this meeting, the plaintiff agreed to remedial training.  *See* August 17, 2010 Supervisor Letter.

During the next three weeks, the plaintiff received remedial training that was observed by her supervisor, who noted that she did not have the basic skills needed to work in the Yard. *See generally* Broadus Decl. Ex. 1 ("T.E.S.T.S. Entries") ECF No. 35-6.  Consequently, on July 1, 2010, the plaintiff was sent home because her work on the equipment was unsafe. Pl. Dep. 178:17–179:23.   Amtrak then provided additional remedial training to the plaintiff in Wilmington, Delaware, where her two training supervisors, both women, observed that she was still unable to satisfactorily perform her job duties and that their "main concern is for her overall safety in the yard."  Def.'s Mot. Ex. U ("Wilmington Eval.") at 2, ECF No. 35-25.

On August 31, 2010, the plaintiff returned to her station in the Yard in Washington, D.C. and was advised at the beginning of her shift that she would be evaluated that night by her female supervisor.  Pl.'s Opp'n Ex. L ("Pl.'s September 1, 2010, Letter to Amtrak President"),

ECF No. 36-14.  As soon as the supervisor got on the engine, however, the plaintiff became ill from stress and immediately left work.  *Id.*  As a consequence, the plaintiff was never evaluated.

On September 1, 2010, the plaintiff wrote a letter to the President of Amtrak complaining that her female supervisor in the Yard had harassed her because she had been labeled as a "snitch."  *Id.*  The letter recounted instances in which her supervisor stood over her, discussed switching her to another shift, told her that her coworkers did not want to work with her because she was unsafe, and marked her August 31, 2010 departure as an unexcused absence when she walked off her shift that night due to stress from the evaluation.  *Id.*

Amtrak notified the plaintiff of a formal investigation triggered by her conduct on August 31, 2010, when she avoided an evaluation by leaving and thereby failing to demonstrate that she was able to perform her duties as Assistant Conductor.  Def.'s Mot. Ex. V ("Not. of Investigation"), ECF No. 35-26.  Following a hearing, the plaintiff was notified of her dismissal, effective October 14, 2010.  Def.'s Mot. Ex. X ("November 16, 2011, Pub. L. Bd. Decision") at 2, ECF No. 35-28.[2]  Within two months of her dismissal, the plaintiff filed, on December 16, 2010, a second Charge of Discrimination with the EEOC and the D.C. office of Human Rights based on what she believed was retaliation in the Yard for the previous sexual harassment complaint she made against Co-Worker 1.  Compl. ¶ 55.

The plaintiff appealed her termination both within Amtrak and to a Public Law Board, an external panel with jurisdiction to resolve disputes between carriers and employees under the Railway Labor Act, and, although the bases for her dismissal were affirmed twice, she was permitted to return to her position as an Assistant Conductor after more training.  Def.'s Mot. Ex.

---

[2] At the hearing, the plaintiff was represented by her union representative and was allowed to cross-examine witnesses and present her own evidence. Def.'s Mot. Ex. W ("February 7, 2011, Amtrak Letter to Plaintiff") at 2, ECF No. 35-27.

W ("February 7, 2011, Amtrak Letter to Plaintiff") at 2-3, ECF No. 35-27; November 16, 2011, Pub. L. Bd. Decision at 5–6. The plaintiff accepted her reinstatement and, after additional training in Washington, D.C., voluntarily transferred to a position in Miami, Florida. Pl. Dep. 249:14–250:5; Pl.'s Mot. Ex. M ("May 15, 2012, Miami Supervisor Letter to Pl."), ECF No. 39.

### 3. Plaintiff's Job in Miami, Florida

On January 17, 2012, the plaintiff began working for Amtrak in Miami, Florida, where she alleges that she was, again, subject to retaliatory actions by her supervisor and co-workers. Compl. ¶¶ 63–64. Specifically, the plaintiff alleges that "Amtrak continued its pattern of retaliation against the Plaintiff by," *id.* ¶ 64, *inter alia*, failing to give her proper assignments, *id.*, scheduling her with "inconsistent and irregular hours," *id.*, forcing her to take the conductor test prematurely, *id.* ¶ 65, and then "wrongfully refus[ing] to allow [her] to work with her recovery medications," *id.* ¶ 70.

According to the plaintiff, she missed the administration of the tests required for promotion to Conductor due to her illness from the stress caused by her Miami supervisor forcing her to take these tests prematurely. Compl. ¶ 65; May 15, 2012, Miami Supervisor Letter to Pl. When the plaintiff identified stress as the excuse for her job absence, Amtrak required that she submit authorization from her physician before she could return to work. Compl. ¶ 69. On June 4, 2012, the plaintiff submitted her physician's authorization allowing her to work while taking medication to treat vertigo. Pl.'s Mot. Ex. D ("Auth. to Work") at 2–3, ECF No. 39. On June 19, 2012, however, Amtrak's own physician denied the authorization because of side effects from the plaintiff's prescribed medication. *Id.* at 1. On July 5, 2012, the plaintiff was dismissed because she had been "absent without authorized medical leave" since failing to take

her exams on May 15, 2012, despite numerous directives by Amtrak for her to make contact to discuss her circumstances.  Pl.'s Mot. Ex. E ("July 5, 2012, Termination Letter"), ECF No. 39.

### B.   Procedural History

On July 28, 2013, the plaintiff filed this lawsuit in the U.S. District Court for the Southern District of Florida.  Her complaint contains six counts, claiming sexual harassment, hostile work environment and retaliation, in violation of Title VII, in Counts I, III and V, respectively, and the same three claims, in violation of the DCHRA, in Counts II, IV and VI, respectively.  Amtrak's Motion to Dismiss for improper venue, under Federal Rule of Civil Procedure 12(b)(3), was granted and the case was subsequently transferred to this Court.  *See* Order Granting in Part Mot. Dismiss ("Mot. Dismiss Order"), ECF No. 19.

Following extended discovery for over six months, *see* Minute Orders, dated December 20, 2013, and May 13, 2014 (allowing discovery, with extensions, from December 20, 2013 until July 30, 2014), Amtrak filed the pending motion for summary judgment.  The plaintiff's initial response to this motion consisted of two brief handwritten paragraphs requesting a jury trial, *see* Pl.'s Opp'n at 1–2, without addressing any arguments set out in Amtrak's moving papers, and accompanied by over 300 pages of various documents.  The plaintiff was afforded an additional opportunity to submit a substantive opposition, *see* Order, dated November 26, 2014, ECF No. 38, which she did by filing a document styled "Motion to Dismiss Defendant's Motion for Summary Judgment," ECF No. 39, that consists of 103 pages, including a number of exhibits already provided by Amtrak with its motion, *compare, e.g.,* Pl.'s Suppl. Opp'n Exs. E, G, J, K, and L, *with* Def.'s Mot. Exs. Y, K, Broadus Decl. Ex. 1, Def.'s Mot. Exs. Q, and V.  Amtrak's motion for summary judgment is now ripe for consideration.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Summary judgment is properly granted against a party who, "after adequate time for discovery and upon motion, . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the burden to demonstrate the "absence of a genuine issue of material fact" in dispute, *id.* at 323, while the nonmoving party must present specific facts supported by materials in the record that would be admissible at trial and that could enable a reasonable jury to find in its favor, *see Anderson v. Liberty Lobby, Inc.* ("*Liberty Lobby*"), 477 U.S. 242, 248 (1986); *Allen v. Johnson*, 795 F.3d 34, 38 (D.C. Cir. 2015) (noting that, on summary judgment, the appropriate inquiry is "whether, on the evidence so viewed, a reasonable jury could return a verdict for the nonmoving party") (internal quotations and citation omitted); *see also Greer v. Paulson,* 505 F.3d 1306, 1315 (D.C. Cir. 2007) ("[S]heer hearsay . . . counts for nothing on summary judgment.") (internal quotation marks omitted); FED. R. CIV. P. 56(c) and (e)(2), (3).

"Evaluating whether evidence offered at summary judgment is sufficient to send a case to the jury is as much art as science." *Estate of Parsons v. Palestinian Auth.*, 651 F.3d 118, 123 (D.C. Cir. 2011). This evaluation is guided by the related principles that "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment," *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014), and "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor," *id.* at 1863 (quoting *Liberty Lobby*, 477 U.S. at 255). Courts must avoid making "credibility determinations or weigh[ing] the evidence,"

since "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150-51 (2000); *see also Burley v. Nat'l Passenger Rail Corp.*, No. 14-7051, 2015 WL 5474078, *3 (D.C. Cir. Sept. 18, 2015). In addition, for a factual dispute to be "genuine," the nonmoving party must establish more than "[t]he mere existence of a scintilla of evidence in support of [its] position," *Liberty Lobby*, 477 U.S. at 252, and cannot rely on "mere allegations" or conclusory statements, *see Equal Rights Ctr. v. Post Props.*, 633 F.3d 1136, 1141 n.3 (D.C. Cir. 2011); *Veitch v. England*, 471 F.3d 124, 134 (D.C. Cir. 2006); *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999); *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993); *accord* FED. R. CIV. P. 56(e). If "'opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.'" *Lash v. Lemke*, 786 F.3d 1, 6 (D.C. Cir. 2015) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). The Court is only required to consider the materials explicitly cited by the parties, but may on its own accord consider "other materials in the record." FED. R. CIV. P. 56(c)(3).

## III.   DISCUSSION

The plaintiff claims that Co-Worker 1 sexually harassed her, Compl. ¶ 75, and that Amtrak supervisors not only did nothing to protect her from this harassment, *id.* ¶ 78, but retaliated against her in all three of her job assignments in two different cities over the span of four years, *id.* ¶ 119, in violation of Title VII, *id.* ¶¶ 73–82, 93–102, 113–22 (Counts I, III, V) and the DCHRA, *Id.* ¶¶ 83– 92, 103– 112, 123–131 (Counts II, IV, VI). Amtrak counters, first, to the extent the plaintiff alleges that she was subject to any retaliation when she worked for

Amtrak in Miami, Florida, those claims are barred by her failure to exhaust the allegations administratively.   Def.'s Mem. at 23–24.   Second, Amtrak argues that the plaintiff has failed to demonstrate that Co-Worker 1's conduct was sufficiently severe or pervasive to amount to a hostile work environment, *id*. at 7–9, particularly since Amtrak promptly and adequately responded to her complaint by initiating a thorough DRO investigation, *id*. at 14–15.   Amtrak further argues that the plaintiff's retaliation claims stemming from her work in Washington, D.C. fail because she has not shown that her evaluating supervisors were aware of her sexual harassment complaint.  *Id*. at 18.  The Court discusses each of Amtrak's arguments *seriatim* below.[3]

### A.   The Plaintiff Failed to Exhaust Claims Arising from Her Amtrak Job in Miami, Florida

The plaintiff filed two charges of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the D.C. Office of Human Rights, on March 16, 2010 and December 16, 2010, based on events that occurred when she was assigned to the Road and the Yard, in Washington, D.C., respectively, *see* Compl. Ex. A ("First Charge of Discrimination"), ECF No. 1-3; *id*. Ex. C ("Second Charge of Discrimination"), ECF No. 1-5.  No administrative complaint or charge was ever filed for any events occurring after the plaintiff's voluntary transfer to an Amtrak job in Miami, Florida.   Consequently, Amtrak argues that to the extent the plaintiff has asserted Miami-based claims of retaliation, these claims are barred due to lack of administrative exhaustion.  Def.'s Mem. at 23.  The Court agrees.

---

[3] The same analysis applies to the plaintiff's claims under both Title VII and the DCHRA and these "claims thus rise and fall together." *Burley*, 2015 WL 5474078, at *3. *See also Bryant v. District of Columbia*, 102 A.3d 264, 268 (D.C. 2014) ("[t]he analytical framework for establishing a prima facie case of retaliation is the same under both the DCHRA and Title VII"); *Estenos v. PAHO/WHO Federal Credit Union*, 952 A.2d 878, 886–88 (D.C. 2008) (noting cases construing Title VII are applicable "in interpreting and applying the provision of the DCHRA"); *Fred A. Smith Management Co. v. Cerpe*, 947 A.2d 907, 913–14 (D.C. 2008) (same); *Lively v. Flexible Packaging Ass'n*, 830 A.2d 874, 887–89 (D.C. 2003) (Title VII analysis is applicable to DCHRA hostile work environment claims).

Under Title VII, plaintiffs "'must timely exhaust the[ir] administrative remedies before bringing their claims to court.'" *Payne v. Salazar*, 619 F.3d 56, 65 (D.C. Cir. 2010) (alteration in original) (quoting *Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997)); *see also Love v. Pullman Co.*, 404 U.S. 522, 523 (1972); *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 104–5, 109 (2002) (a Title VII plaintiff must "file a charge with the [EEOC] either 180 or 300 days after the alleged unlawful employment practice occurred"); 42 U.S.C. § 2000e-5(f)(1). Additionally, a plaintiff must file a separate charge in order to exhaust administratively each discrete retaliatory or discriminatory act. *Morgan*, 536 U.S. at 114.

The D.C. Circuit in *Payne* left open the question whether, after *Morgan*, each new discrete discriminatory act must be filed with the EEOC, or whether, according to a pre-*Morgan* line of D.C. Circuit cases, any unexhausted Title VII claim may be eligible for judicial adjudication, without the necessity of separate administrative processing, if it is within the scope of the prior EEO investigation, as "reasonably related" to the filed charge. Under the pre-*Morgan* approach, a charge may be regarded as "reasonably related" to a filed charge if, "at a minimum," it "arise[s] from an administrative investigation that can reasonably be expected to follow the [filed] charge of discrimination" since this "connection" gives the agency "an opportunity to resolve the claim administratively before the employee files her complaint in district court." *Payne*, 619 F.3d at 65 (original alterations, internal quotations and citations omitted). Without deciding "whether *Morgan* did in fact overtake that line of case," the D.C. Circuit concluded in *Payne* that the plaintiff had failed to exhaust certain retaliation claims when the underlying conduct occurred several months after the conclusion of the EEO investigation, noting that "the retaliatory conduct . . . could not possibly have 'arisen from the administrative

investigation' that followed the EEO complaints . . . because the administrative investigation of those complaints ended" well before the alleged retaliatory conduct occurred. *Id*.

While a minority view on this Court is that the "reasonably related" test for unexhausted claims, as set out in *Park v. Howard University*, 71 F.3d 904, 907 (D.C. Cir. 1995), survives *Morgan*, the majority view has interpreted *Morgan* to "require exhaustion for all discrete acts of retaliation after an administrative charge is filed, 'regardless of any relationship that exists between those discrete claims and any others.'" *Hicklin v. McDonald*, No. 14-1569, 2015 WL 3544449, at *2–3 (D.D.C. June 8, 2015) (quoting *Rashad v. Wash. Metro. Area Transit Auth.*, 945 F. Supp. 2d 152, 165–66 (D.D.C. 2013)). This Court has followed the majority view. *See Smith v. Lynch*, No. 10-1302, 2015 WL 4324167, at *9 (D.D.C. July 15, 2015).

Regardless, under either the majority or the more lenient minority view of the Supreme Court's holding in *Morgan*, the plaintiff's Miami-based retaliation claims would be barred for failure to exhaust administrative review. The plaintiff began work "at the Miami Florida crew base" in January 2012, Compl. ¶ 63, and, thus, her allegations that her new supervisors and co-workers engaged in retaliatory conduct occurred over a year after the alleged retaliation that was the subject of her two 2010 EEO charges. Moreover, the plaintiff's Miami-based retaliation allegations point to actions by new supervisors and co-workers living in a geographically distant city from where the conduct described in the first two EEO charges occurred. Given the gap in time, the differences in personnel involved, the difference in work site locations at issue, and the differences in the retaliatory actions alleged, an administrative investigation of the first two EEO charges concerning alleged events that occurred in D.C. would not have led the EEOC to Amtrak's Miami office. *Accord* Mot. Dismiss Order (District Court for the Southern District of Florida concluding "that these post-EEOC-complained-of-events do not fall within the

reasonably expected scope of an EEOC investigation of [the plaintiff]'s administrative charges filed in March and December 2010[.]").

Consequently, the Court finds that, even under the minority interpretation of *Morgan*, the plaintiff's Miami-based retaliation allegations are not reasonably related to the EEO charges that she filed and, therefore, may not be deemed exhausted. Accordingly, Amtrak is entitled to summary judgment on any Miami-based retaliation claim asserted by the plaintiff due to her failure to exhaust.

### B.     Sexual Harassment and Hostile Work Environment Claims Arising from Plaintiff's Amtrak Jobs in Washington, D.C.

The allegations underlying the plaintiff's sexual harassment and hostile work environment claims arise out of the same events that allegedly occurred during her tenure working in Washington, D.C, *compare* Compl. ¶¶ 73–82, *with* ¶¶ 93–102; *compare* ¶¶ 83–92, *with* ¶¶ 103–112, and, therefore, will be addressed together.

The law is well-settled that sexual harassment may create a hostile environment when it is so "'severe or pervasive [as] to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Taylor v. Solis*, 571 F.3d 1313, 1318 (D.C. Cir. 2009) (alterations in original) (quoting *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67 (1986)). Even accepting as true the plaintiff's allegations that her interactions with Co-Worker 1 were inappropriate, uninvited and unwelcome, the allegations fall far short of meeting the threshold for a hostile work environment.

The Court looks to the totality of the circumstances when determining whether the plaintiff has produced enough facts to survive summary judgment that a hostile environment exists, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably

16

interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993); *see also Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 577 (D.C. Cir. 2013); *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008). The bar is set very high; the Supreme Court has emphasized that Title VII is not "a general civility code," *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998), such that "offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment," *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotations omitted).

The plaintiff has alleged hostile work environment claims during her time in Washington, D.C., working both on moving passenger trains on the Road and with empty trains in the Yard. During her time on the Road, the plaintiff claims that she was subjected to sexual harassment and a hostile work environment based on three allegedly sexual comments made by Co-Worker 1, his conduct in allegedly brushing up against her, and his rude behavior in pointing out her work deficiencies after she rejected his sexual advances on July 5, 2009. *See supra* Part I.A.1.

At the outset, Amtrak argues that evidence of Co-Worker 1's conduct after the plaintiff confronted him on July 5, 2009, should not be considered as part of any hostile work environment because the subsequent conduct consisted only of Co-Worker 1's comments about the plaintiff's deficient work performance. Def.'s Mem. at 7–8. Indeed, "evidence that bears no connection to the plaintiff's protected status cannot support a hostile work environment claim." *Herbert v. Architect of Capitol*, 839 F. Supp. 2d 284, 299 (D.D.C. 2012). At the same time, "a 'hostile work environment claim is composed of a series of separate acts that collectively constitute *one* unlawful employment practice. . . . A court's task is to determine whether the acts about which an employee complains are part of the *same* actionable hostile work environment

practice.'" *Bergbauer v. Mabus*, 934 F. Supp. 2d 55, 70 (D.D.C. 2013) (emphasis and ellipses in original) (quoting *Morgan*, 536 U.S. at 120). Here, the plaintiff contends that Co-Worker 1's criticism of her work performance after July 5, 2009, stemmed from her rejection of his sexual advances and should be considered as part of the same actionable hostile work environment claim. Pl.'s July 9, 2009, Email at 2.

The Court need not resolve this argument, however. Even considering all of Co-Worker 1's conduct together, the plaintiff still fails to make a sufficient showing that this conduct was sufficiently severe or pervasive as to create a hostile work environment. First, the incidents were isolated and infrequent occurrences—consisting of only four interactions that the plaintiff asserts were sexual in nature over the period of late 2008 or early 2009 through July 4, 2009. Such a "few isolated incidents of offensive conduct do not amount to actionable harassment." *Stewart v. Evans*, 275 F.3d 1126, 1134 (D.C. Cir. 2002). Moreover, these interactions may have made the plaintiff uncomfortable but they were not so overt, constant and aggressive as to amount to severe or chronic abuse. *See, e.g., Martinez v. P.R. Fed. Affairs Admin.*, 813 F. Supp. 2d 84, 97 (D.D.C. 2011) (finding numerous sexually inappropriate comments, heightened scrutiny, reassignment of job duties to others, creation of procedures that necessitated more contact not so pervasive, severe or abusive as to create a hostile work environment); *Akonji v. Unity Healthcare, Inc.*, 517 F. Supp. 2d 83, 97–98 (D.D.C. 2007) (no hostile work environment where plaintiff's supervisor repeatedly touched plaintiff and made sexually suggestive comments); *Coles v. Kelly Servs., Inc.*, 287 F. Supp. 2d 25, 26–27, 31 (D.D.C. 2003) (sending sexually explicit emails, mimicking sex, and after the plaintiff rejected sexual advances, making physically threatening gestures and swearing do not constitute hostile work environment). The four interactions occurring over seven months that are described by the plaintiff involved no

aggressive or threatening physical contact or the type of chronic verbal abuse that has been found sufficient to defeat summary judgment. *See*, *e.g.*, *Regan v. Grill Concepts-D.C., Inc.*, 338 F. Supp. 2d 131, 137–38 (D.D.C. 2004) (denying summary judgment where supervisor repeatedly made sexually charged and degrading comments and a fellow coworker exposed herself); *Berman v. Wash. Times Corp.*, No. 92-2738, 1994 WL 750274, at *3 (D.D.C. Sept. 23, 1994) (denying summary judgment on DCHRA claims where supervisor "pursued [the plaintiff] around the office on numerous occasions, commented on her attractive appearance, and intentionally intimidated her[,]" and the "work environment was replete with misogynistic decorations, including degrading signs, pictures of scantily-clad women, and a pornographic game."). Indeed, none of the plaintiff's interactions with Co-Worker 1 that she alleges were of a sexual nature were of sufficient seriousness to prompt the plaintiff to report the incidents to her supervisors until a month or more after the incidents occurred and only when her work performance was subject to criticism by her supervisors. [4]

The post-July 4, 2009 interactions between the plaintiff and Co-Worker 1 allegedly involved the latter's criticism of the plaintiff's work performance. [5] Even if, as the plaintiff alleges, Co-Worker 1's criticism was motivated in part by the plaintiff's rejection of his alleged unwanted sexual attention, the plaintiff does not dispute, and witnesses corroborate, that Co-Worker 1 had legitimate reasons to criticize the plaintiff's poor job performance, including that: the plaintiff waited until Co-Worker 1 told her to find seats for passengers seated on the floor of the train, Def.'s Mot. Ex. E ("Pl.'s Interrogs.") at 18, ECF No. 35-9; she created an unsafe

---

[4] Even after the plaintiff raised the sexual harassment charge, which triggered an internal investigation, she apparently requested that the investigation stop. September 4, 2009, Email Exchange.
[5] Although the parties dispute whether Co-Worker 1 is a supervisor under Title VII, *compare* Def.'s Mem. at 12–13, *with* Pl.'s Suppl. Opp'n at 2, this issue need not be resolved since, regardless of Co-Worker 1's position *vis a vis* the plaintiff, no hostile work environment was created by either his conduct or his criticism, along with others, of the plaintiff's work performance.

condition when she turned seats around, Def.'s Mot. Ex. H ("Starver Dep.") 81:1–17 (explaining that Assistant Conductors are not trained to turn seats, which could be unsafe when not properly performed), ECF No. 35-12; and she admitted to disobeying Co-Worker 1's order to turn the seats around, until asked by their supervisor, Pl.'s Interrogs. at 19. In addition, the plaintiff was apparently known for refusing to properly ticket passengers who missed their stops. DRO's Investigative Findings at 5 (confirmed by a witness).

Even if Co-Worker 1 could have relayed his criticism in a more polite manner, any embarrassment the plaintiff felt from his public criticism does not rise to the level of a hostile work environment. *See Faragher*, 524 U.S. at 788 ("[c]onduct must be extreme to amount to a change in the terms and conditions of employment"); *Rattigan v. Gonzales*, 503 F. Supp. 2d 56, 79 (D.D.C. 2007) (finding that unrelated comments, threats and slights at work do not constitute hostile work environment and that "not everything that makes an employee unhappy is an actionable" under Title VII").[6] In addition, at the time when a supervisor reprimanded the plaintiff for creating an unsafe condition, followed by a meeting with three supervisors, on July 10, 2009, none of the supervisors were aware of the plaintiff's sexual harassment charge. Thus, the plaintiff has utterly failed to show that evidence regarding the plaintiff's poor job performance on the Road has any connection to her gender or her allegations of sexual harassment and, therefore, cannot support her hostile work environment claim. *See Davis v.*

---

[6] To the extent the plaintiff alleges that she was constructively discharged due to the hostile work environment, *see* Compl. ¶ 119, 129, this claim fails. First, the plaintiff was not dismissed as a result of her poor job performance at her Road job assignment, but merely voluntarily transferred to the Yard. Second, even if her voluntary transfer were construed to be an involuntary demotion amounting to a constructive discharge, her claim would still fail. The standard for constructive discharge is even more onerous than that for a standard hostile work environment claim. *See Pa. State Police v. Suders*, 542 U.S. 129, 134 (2004) ("[T]o establish 'constructive discharge,' the plaintiff must make a further showing: She must show that the abusive working environment became so intolerable that her resignation qualified as a fitting response."). Since the plaintiff is unable to show that the harassing behavior she alleges was sufficiently severe or pervasive to support a hostile work environment claim, her constructive discharge claim fails for the same reason.

*Coastal Int'l Sec., Inc.*, 275 F. 3d 1119, 1122–24 (D.C. Cir. 2002) (affirming summary judgment for employer and rejecting sexual harassment claim where evidence showed that alleged harassment was "motivated by a workplace grudge, not sexual attraction"); *Dudeley v. Wash. Metro Area Transit Auth.*, 924 F. Supp. 2d 141, 171 (D.D.C. 2013) ("A litany of cases shows that simply having a rude, harsh, or unfair boss is not enough for a hostile work environment claim."); *Singh v. U.S. House of Representatives*, 300 F. Supp. 2d 48, 56 (D.D.C. 2004) ("Criticisms of a subordinate's work and expressions of disapproval (even loud expressions of disapproval) are the kinds of normal strains that can occur in any office setting[.]").

The plaintiff also makes a hostile work environment claim covering her time working in the Yard, because her new supervisors repeatedly reprimanded her and closely observed her due to poor work performance, a male supervisor sent her home because she was unsafe, and she was transferred from one shift to another because a male co-worker did not want to work with her. Pl.'s Suppl. Opp'n at 5–6; Pl. Dep. at 142:25–143:12. Similar to the plaintiff's allegations about her job assignment on the Road, the plaintiff has failed to produce evidence showing that her treatment in the Yard was due to her gender, rather than to continuing legitimate concern over her job performance and the safety risks posed by her poor performance. Criticism of the plaintiff's job performance in the Yard appears to have been regularly and consistently given, leading to several periods of remedial training without apparent improvement. The plaintiff has not shown that this criticism was related to the plaintiff's membership in a protected class, instead, this criticism was related to the perceived safety risks posed by her job performance.

In sum, the Court finds that the plaintiff has failed to produce sufficient evidence for a reasonable jury to find that Amtrak's treatment of the plaintiff was due to anything other than her

poor job performance or that this treatment amounted to sexual harassment or a hostile work environment. Accordingly, Amtrak is entitled to summary judgment on Counts I through IV.

### C.   Retaliation Claims

The plaintiff also makes two retaliation claims: first, that her co-workers and supervisors retaliated against her for filing sexual harassment complaints against Co-Worker 1, both internally and with the EEOC; and, second, that her Yard supervisors retaliated against her for writing a letter, on September 1, 2010, to the President of Amtrak complaining of hostile work environment and unfair treatment by a female Yard supervisor. Compl. ¶¶118–19, 128–29. As discussed below, these retaliation claims fail.

To prevail on a claim of unlawful retaliation, an employee must show "she engaged in protected activity, as a consequence of which her employer took a materially adverse action against her." *Weber v. Battista*, 494 F.3d 179, 184 (D.C. Cir. 2007). "A materially adverse action is one that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.'"  *Taylor*, 571 F.3d at 1320 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)). While the three-step burden-shifting test of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies to retaliation claims based, as here, on circumstantial evidence, the D.C. Circuit has instructed that if the employer offers a legitimate, nondiscriminatory reason for its action, then the court "need not—and should not—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*." *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008); *see Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009) (retaliation claim). Instead, "the court should proceed to the question of retaliation *vel non*," which question can be resolved "in favor of the employer based either upon the employee's failure to rebut its explanation or upon the employee's failure to prove an element of her case," such as whether "her employer took a materially adverse action against

her." *Taylor*, 571 F.3d at 1320 n.12; *see also Hernandez v. Pritzker*, 741 F.3d 129, 133 (D.C. Cir. 2013) (noting that "the 'central question' in [the] case is whether [the plaintiff] has produced sufficient evidence for a reasonable jury to find those reasons were but pretexts for retaliation") (quoting *McGrath v. Clinton*, 666 F.3d 1377, 1383 (D.C. Cir. 2012)); *Hamilton v. Geithner*, 666 F.3d 1344, 1351 (D.C. Cir. 2012) ("Where, as here, the employer claims a legitimate, non-discriminatory explanation for its decision to promote one employee over another, the 'one central inquiry' on summary judgment is 'whether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited basis.'") (quoting *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1226 (D.C. Cir. 2008)); *Talavera v. Shah*, 638 F.3d 303, 308–309 (D.C. Cir. 2011).

Focus on this "one central inquiry" is appropriate because a legitimate non-discriminatory reason for the employer's actions breaks the necessary "but-for causation" link between the protected activity and the adverse employment action. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528, 2533 (2013). The D.C. Circuit has instructed that "this question" is considered "'in light of the total circumstances of the case,'" asking "'whether the jury could infer discrimination from the combination of (1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff or any contrary evidence that may be available to the employer.'" *Hamilton*, 666 F.3d at 1351 (quoting *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1289, 1291 (D.C. Cir. 1998) (en banc)).

At the outset, the plaintiff indisputably engaged in protected activity both by utilizing the internal grievance procedure, which triggered the DRO investigation, as well by filing EEOC

complaints in March and December 2010. *See Richardson v. Gutierrez,* 477 F. Supp. 2d 22, 27 (D.D.C. 2007) ("It is well settled that Title VII protects informal, as well as formal, complaints of discrimination."); *Bell v. Gonzales,* 398 F. Supp. 2d 78, 94 (D.D.C. 2005) ("Initiation of EEO counseling to explore whether an employee has a basis for alleging discrimination constitutes protected activity, even in the absence of an unequivocal allegation of discrimination."). Yet, as discussed below, the alleged retaliatory actions taken against her in Washington, D.C., do not amount to materially adverse actions and, even if they did, the plaintiff has not presented any, let alone sufficient, evidence to rebut Amtrak's legitimate, nondiscriminatory reasons for its actions.

### 1. Alleged Retaliation for the Plaintiff's Sexual Harassment Complaint

The plaintiff alleges that because she filed a sexual harassment complaint against Co-Worker 1, she was subjected to a variety of retaliatory actions. First, the plaintiff claims that her supervisor retaliated against her by warning her that "another employee had seen her abdomen and stomach in the lady's room," Compl. ¶ 119 (a), and that the plaintiff should "watch [herself] too," Pl. Dep. 99:8–11. This comment from her supervisor was apparently made to the plaintiff in private and, on its face, appeared to caution the plaintiff about how her own conduct could offend others, without affecting the plaintiff's employment negatively in any way. Even though, in the retaliation context, actions amounting to an "adverse employment action" have "a broader meaning" and "are 'not limited to discriminatory actions that affect the terms and conditions of employment,'" *Baird v. Gotbaum,* 662 F.3d 1246, 1249 (D.C. Cir. 2011) (quoting *Burlington,* 548 U.S. at 64), this single comment critical of the plaintiff's own interactions with coworkers, simply does not amount to retaliation. *Baloch,* 550 F.3d at 1199 ("sporadic verbal altercations or disagreements do not qualify as adverse actions for purposes of retaliation claims").

Second, the plaintiff alleges that she was retaliated by her supervisors and Co-Worker 1 because she received negative comments in her work record the day after she filed her internal

harassment complaint and thereafter. Pl.'s Suppl. Opp'n at 2. While the timing of the negative comments, at first blush, gives pause, Amtrak argues that this claim fails because these negative comments are not materially adverse actions and the plaintiff has not demonstrated that she would not have received those negative marks but for her harassment complaint. Def.'s Suppl. Reply Supp. Mot. Summ. J. ("Def.'s Suppl.") at 8–9, ECF No. 40. The Court agrees for several reasons.

First, the negative comments in the plaintiff's work record and the verbal criticism of the plaintiff's work performance were based on observations of actions taken by the plaintiff that she does not dispute and, therefore, are not linked to her protected behavior. Indeed, the plaintiff does not demonstrate that the negative comments in her work record in July 2009 are linked to her filing the harassment complaint since her immediate supervisor was unaware of the alleged sexual harassment at the time the criticism was documented and was only made aware a month later when the plaintiff sent her an email regarding her sexual harassment complaint on August 6, 2009. DRO's Investigative Findings at 8.

Between July 9, 2009, when the plaintiff first emailed her complaint to the DRO, and October 26, 2009, when the plaintiff voluntarily transferred to work in the Yard, the plaintiff received two negative marks. *See* Pl.'s Suppl. Opp'n, Ex. B ("Work Record") at 4–5, ECF No. 39. The first for failing to obey Co-Worker 1's direction to return seats to their original position pursuant to safety protocol, *id*. at 4, and the second for failing to obey Co-Worker 1's instructions to ticket a passenger who had missed her stop, *id*. at 5; *see also* DRO's Investigative Findings at 3. Amtrak presented legitimate reasons for these informal reprimands that the plaintiff does not rebut. The plaintiff, in fact, violated standard policies by failing to obey Co-Worker 1's instructions, when he was serving as a conductor. Specifically, conductors must

ensure that every passenger is safe and ticketed properly, Pl.'s Suppl. Opp'n, Ex. C ("Amtrak Service Standards Manual") at 1, ECF No. 39 ("The Conductor is responsible for the safe movement and operation of the train, the collection and protection of Amtrak ticket revenue[.]"), and Assistant Conductors "must follow the Conductor's instructions," *id*. Co-Worker 1's instructions about the proper arrangement of seats comported with applicable safety rules: Assistant Conductors are not permitted to turn around seats because it is unsafe. *See* Starver Dep. 81:1–17. In addition, another coworker, whom the plaintiff had identified as a witness for the DRO, advised the DRO investigator that the plaintiff routinely refused to ticket passengers properly and that Co-Worker 1 bore the consequences. DRO's Investigative Findings at 5. In short, the criticism of the plaintiff's work performance appears warranted and unrelated to either her gender or her charge of sexual harassment.

Second, the plaintiff alleges also that her new co-workers in the Yard, to which she voluntarily transferred from the Road, retaliated against her because of her sexual harassment complaint. Compl. ¶¶ 119, 129. Amtrak argues that this also fails because the plaintiff has presented no proof that any of her co-workers knew of the sexual harassment complaint at the time. Def.'s Supp. at 10. In fact, each of her supervisors in the Yard submitted declarations that they did not know of the plaintiff's internal sexual harassment complaint at the time she worked there after transferring from the Road. *See* Smith Decl. ¶ 18; Broadus Decl. ¶ 20; Maldonado ¶ 16. The plaintiff also alleges that a male co-worker did not want to work with her because of her reputation, but the plaintiff herself admitted that she did not have actual personal knowledge of this and cites only rank hearsay to support this allegation. Pl. Dep. 247:15–248:8 ("Q: What evidence do you have that the reason that you were pulled off of the job is because you filed a charge against [Co-Worker 1]? A: My engineer on 29C said to me that people do not want to

work with me because I get people in trouble and fired. . . . Q: Did he mention who those people were? A: He didn't really call anyone by name, but I knew who he was talking about."). This is insufficient to defeat a summary judgment motion. *See Greer,* 505 F.3d at 1315 ("[S]heer hearsay . . . counts for nothing on summary judgment.") (internal quotation marks omitted). The plaintiff therefore cannot establish that any of the employment actions taken were motivated by her sexual harassment complaint.

Finally, criticism of an employee's work performance that "do[es] not amount to a pattern of antagonism" simply does not amount to an adverse employment action sufficient to make out a case of retaliation. *Taylor,* 571 F.3d at 1322 (finding employer entitled to summary judgment on retaliation claim because allegations that plaintiff's supervisor "criticized her work and yelled at her . . . [do] not provide[] a reasonable jury any basis upon which to disbelieve the [employer's] explanation"); *Turner v. U.S. Capitol Police Bd.,* 983 F. Supp. 2d 98, 107 (D.D.C. 2013) (poor performance evaluation does not constitute materially adverse action because it would not have "dissuaded a reasonable worker from making or supporting a charge of discrimination" where there is no allegation that it "caused [the] plaintiff to miss out on a bonus, salary increase, or promotion," or that it "hindered her professional opportunities") (citing *Taylor,* 571 F.3d at 1321). Rather than being confronted with a "pattern of antagonism," the plaintiff was offered numerous training opportunities to address the deficiencies observed in her performance.

For all of these reasons, no reasonable jury could conclude that the plaintiff has made a sufficient showing that critical comments about her work performance were made in retaliation for her protected activity and, therefore, Amtrak is entitled to summary judgment on this aspect of the plaintiff's retaliation claim.

### 2.  Retaliation for the Plaintiff's Letter to the President of Amtrak

The plaintiff alleges that her first termination, effective on October 14, 2010, was in retaliation for her sending a letter, on September 1, 2010, to the President of Amtrak. Compl. ¶¶ 118, 128. She sent this letter the day after walking off the job to avoid an evaluation after her remedial training in Wilmington, Delaware. In the letter, the plaintiff complained about her female Yard supervisor's conduct toward her, including attempting to evaluate her following her remedial training on the night of August 31, 2010. *See* Pl.'s September 1, 2010, Letter to Amtrak President. On September 8, 2010, the plaintiff received a Notice of Formal Investigation from Amtrak, directing her to appear for a formal investigation, charging her with violation of two Standards of Excellence based on her leaving her job on August 31, 2010. Not. of Investigation.

Amtrak argues that this retaliation claim fails because the plaintiff has not established that the Notice of Formal investigation was motivated by her letter.[7] Def.'s Mem. at 22. The Court, again, agrees. First, the plaintiff has not shown who, if anyone, involved with the decision to send her the Notice of Formal Investigation, was even aware of the letter to Amtrak's president. Second, the Notice of Formal Investigation and her first termination were based on undisputed events that occurred on August 31, 2010. Despite knowing that she would be evaluated, by her own admission, she walked off the job due to "stress." Not. of Investigation.[8]

---

[7] Amtrak disputes whether the plaintiff's letter to the President of Amtrak is protected activity under Title VII, *see* Def.'s Mem. at 21–22, but the Court need not resolve this issue because, even if it is, the plaintiff has failed to submit sufficient evidence to rebut the legitimate, non-retaliatory reasons for the plaintiff's dismissal.

[8] Following the Notice of Formal Investigation, the plaintiff attended a hearing about the charge with her union representative, during which time she was allowed to introduce her own evidence and cross-examine witnesses. *See* Amtrak February 7, 2011, Letter to Pl. at 2. She was found to have violated the two Standards of Excellence and terminated. *Id.* After years of administrative appeals, those findings have not been disturbed. *See generally id.*; November 16, 2011, Pub. L. Bd. Decision.

Therefore, the plaintiff has not provided sufficient evidence to rebut Amtrak's legitimate, nondiscriminatory explanation for the adverse employment action of her dismissal in 2010.

Accordingly, Amtrak is entitled to summary judgment on the plaintiff's retaliation claims in Counts V and VI.

## IV.    CONCLUSION

Upon consideration of the plaintiff's complaint and the voluminous exhibits submitted by both parties, the Court concludes that the plaintiff has failed to produce sufficient evidence for a reasonable jury to find that Amtrak's asserted non-discriminatory reasons for its treatment of the plaintiff—namely, her poor job performance in three different job assignments in two different cities—was not the actual reason for such treatment.  Accordingly, the defendant's motion for summary judgment on the plaintiff's claims of sexual harassment, hostile work environment and retaliation is granted.

The Clerk of the Court will be directed to close this case.

An Order consistent with this Memorandum Opinion will issue contemporaneously.

**DATE:** September 29, 2015

_____
BERYL A. HOWELL
United States District Judge